Good morning, I'm John Macon with Green & Pepper, Salander & Lally. I'm here with my partner Jim Green and my colleague Jennifer Cahill. We represent St. Paul Fire & Marine Insurance Company. We're here today because the central issue before the court is voluntary reformation. It shouldn't be, but that's why we're here. The district court below found that California law adopts, incorporates, includes a concept of voluntary reformation in order to... Wouldn't it, you know, rather than get all tangled up with the word reformation, which usually means going to court to get the court to straighten out a disagreement among the parties, a fraud or something else, wouldn't this really be just a contract modification if you don't do it in court? Your Honor, that's where the rubber meets the road in this case. When the parties choose to modify an agreement, that means they had a written agreement and they wish to change that agreement prospectively. When you reform a document, when you reform a written agreement... But why does it have to be prospectively? Let's just say that two parties enter into a contract, it gets miswritten, and they get into it a little bit and they say, whoops, this isn't what we agreed to, so let's change it now to the way it was, the way we agreed to it, and that's going to change the payments that have already been made. Why does it have to be prospectively? The reason, Your Honor, is for the very reason that was cited in footnote 12 of the 20th century insurance versus Liberty Mutual case, which is under California law, the written documents between the parties are presumed to include their intent. In other words, once you sign a document, once you accept the written terms, that's your deal. As between them, though, if they both agree, those were not the agreement. They don't have any trouble, do they? I mean, the law doesn't say you can't agree to that. Actually, it does, Your Honor. It does. In California, if the parties know that there is a mistake in the document, they can't say so. They can't. What they can't do is they can go and they say, okay, we got a mistake. The record in this case shows that apparently Ms. Allbritton from Granite, Mr. Carney from McCarran-Hudson, which was Granite's broker, and Mr. Briska at American Casualty, who issued the endorsement, all knew that when the policy was endorsed in September of 1995, that this would not include the intended excess DIC terms. All right. Now, it's interesting to note that, in fact, Gibbons and Reed had been added as of May 8th on a direct named insured basis by a written binder signed, proposed by McSherry and Hudson, signed by Mr. Briska. So they were already named parties. What the law says, as the Brown case makes clear, is when parties know there's a mistake, they have to do something about it. They're not allowed just to sit back and say, oh, well, we won't worry about it. We won't worry about that until it actually means something. Well, doesn't that protect someone who has relied upon the contract as written? No, Your Honor, it doesn't. Now, let me ask you, has your client ever relied upon this contract as not being an excess contract? Your Honor, reliance wouldn't make any difference for reformation. It makes a difference to me, Counselor. I understand, Your Honor. And that's why I ask it. Your Honor. Is there any evidence that your client ever relied upon the contract as written accidentally if accidental? There is no evidence that my client ever said... Because that's what concerns me the most. If these people got together and said, hey, let's change the deal and leave those guys holding the bag, that would be a different case than the one you've just told me we have here. Your Honor, you do have that fact. You asked me a question when you asked, was there reliance? That's right. The answer is, did my client say, we would have approached this case differently? And the answer is, because of the nature of the contracts involved, there was no opportunity to approach it any differently, both given... Tell me, Counselor, now, have we got a mistake in a question and answer and you want, without their permission, to change your answer? No, Your Honor, there's no mistake. There's no reliance on your client's part, was there? The answer is, no reliance in the sense that we talk about in the law. However, there was reliance in the sense that when you have insurers, where you have multiple insurers and multiple insureds, the obligations of the insurers are interdependent. The law in California is very clear that one insurer and an insured cannot get together and decide to put all the risk onto one other insurer. Right, after the fact. And in fact, that's what happened here, Your Honor. In this case, the parties knew in 1995 that the endorsement that made Gibbons and Reid a named insured made them a named insured without limitations. They knew it in 1995, they took no steps, they made no efforts, they did nothing to correct that. If they had corrected it then. If they had corrected it then, we might have an issue to talk about here now, Your Honor. Oh, we've got an issue now. I know we do, Your Honor. That's why we're all here. But the question I'm asking you is, seriously, if they had corrected it right then, it would not change your client's position at all, would it? Our client's position was that if this was in fact truly a mistake, if this in fact was truly something that was a result of a reasonable error, if this was in fact a matter that had been duly and diligently pursued, they may have been able to meet the clear and convincing evidence standard for reformation under California law. Judge Hill asked you if there was evidence of reliance. I'd like to ask if there's any evidence of collusion. Your Honor, I would say in the sense of collusion, do you mean that they got together and decided that it was better for St. Paul to take this lump than for American Casualty? No, I mean that the time that they exchanged this written information, which suggests that they approached it as DIC excess, that this was being done for a collusive purpose. No, Your Honor. I think at the time, I think the evidence before the court and in the record is that in the negotiations and discussions in May of 1995, that is what they were talking about. They were talking about excess DIC. The difficulty is that over time, when the written terms were received, they were accepted as they were. There was no complaint that it wasn't excess DIC. There was no payment of premiums. This excess DIC coverage was supposed to come at a cost. There was supposed to be a payment of premiums. There was no demand for premiums by American Casualty. In fact, what happened here is all the parties knew there was a mistake, if a mistake there was, and decided that it was acceptable. They'd live with it. In other words, to the extent that they may have had an earlier intent in May of 1995, that intent apparently had changed by the fall of 1995 and continued that way. It's noteworthy. Then that would have been collusive to change it after they intended to leave it that way. No, Your Honor, they wouldn't. The evidence shows that when when the mistake was found, discovered, they intended to have that contract, that mistaken contract. That's the only thing to really be inferred from the evidence, Your Honor. And it's what California law requires. If parties know there's a mistake in the written terms, they're not allowed to sit back and wait until to see if those consequences. On those cases where it's between those two parties litigating, one says there was a mistake and the other says, oh, no, there was no mistake. I meant it to be that way. And they are litigating that case. And the law requires the one asserting mistake to prove it by clear and convincing evidence. Isn't that the case you've given us? No, Your Honor. Do you have one where a third party gets the opportunity to say whether and when they can correct their mistake? Yes, Your Honor. As a matter of fact, the 20th century insurance versus Liberty Mutual case was that very case. In that case, you'll recall Admiral Files served an endorsement that lowered its limits. And in that case, its argument was, well, but that's what we always intended. That's what the party is always meant to do. That's what we were meant to do. Now, who are they arguing with? They were arguing with Liberty Mutual at that stage, which was one of the multiple insurers that covered the risk that was involved in that case. But the one they insured agreed that the limits were wrong. That was the allegation, Your Honor. The allegation, the contentions that were made and rejected by a panel of this court applying California law said, no, what you're alleging is not a modification after the loss. If you want to go back, in other words, you want to make that effective. It has to be a reformation of the contract. And you have to prove that by clear and convincing evidence. You're not allowed simply to say that that's what you always meant. California law is clear on that. Both parties can't say that. Correct. But that could, if both parties could say it, it could lead to collusion. Yes, it could, Your Honor. That's right. That's one of the reasons that the Kaiser Hospital versus Northstar Reinsurance case made it clear that in California, one insurer and another insured are not allowed to ride roughshod over the rights of the other insurers. Given the way California law has developed with insurance law, when you have multiple insurers on multiple insureds insuring the same event, for lack of a better term, without getting into a fight about what we're talking about, there's always the opportunity for there to be an argument that somebody is getting a windfall or somebody should have to cover or you should have to cover first. The cases are fairly, I won't say legion, but there are a fair number of them. For example, one case where there was an argument that the intention was that the lesser of the properties policy was supposed to be excess over the lessee's primary policy. That's the Commerce and Industry versus Chubb insurance case. The California Court of Appeals says we're not going to let unstated intentions drive what happens with respect to the insurance policies they cover as they are written. Insurance contracts are written documents. It's not filling a gap in my notes. I was following your your argument starting out. You said if the parties know parties to a contract, know of a mistake in the contract. Yes. And don't change it. Yes. At that time, then I couldn't quite follow what you were saying came downstream. They cannot later change it. What I'm saying over time, Your Honor, is that while the parties are entitled to modify their agreements going forward, prospectively, if they intend to modify it to argue, though this was the contract as it always was meant to be, as it was always intended, they have to seek reformation. Now, what drives that? In other words, is it an estoppel argument? What drives it, Your Honor, is a concern about written contracts and their ability to be relied upon by commerce and society. For example, I know this is an old case, but in Pearson versus McHale, which is a Supreme Court case back in the 1860s, the issue there was a creditor trying to enforce a payment agreement. Mr. Pearson said, you can't enforce this against me. The creditors and I agreed that we'd take 50 cents on the dollar. And the agreement didn't say that. The agreement just said we agree to pay. And as a matter of fact, the trial court let in the evidence. They let him testify. Oh, yeah. The creditors came in and said, yeah, that's we agree to take 50 cents on the dollar. And what the court said is the parties can't do that. That's parole evidence. We're not going to allow parole evidence to modify the terms of a written contract as it exists at the time. What you have to do is you have to get the court in its power of equity in equity to reform the agreement. And that's to make sure that you do avoid collusion. And as Masterson versus Sines says, the problem that parole evidence is designed to deal with is not only direct fraud, but that over time people might start remembering things in a way that is more favorable. In other words, it's the contract they wish they had made if they know what was going to happen down the road. But as a rule of law, aren't you taking a lot of people on frivolous trips to the courthouse? In other words, in our factual setting, and I think you said may the parties knew how the contracts were written. Yes. Presumably they knew the contracts didn't reflect their intent. And then they don't do anything about it for four years, Your Honor, for X months, no years or what happened. So some place in there, according to you, something triggers and passage of time alone drives them to the courthouse to modify the contract. And but at that point, there's no disagreement. They go to Superior Court in California and say, Your Honor, we have this case. Both of us are plaintiffs. We don't have any defendants. We agree on the result. Will you hear our case? Not true, Your Honor. What triggered in this case when the requirement and the issue occurred when Ms. Cardenas was injured at that point, the written contracts of insurance issued by American Casualty in St. Paul, all both made Gibbons and Reed and Granite Construction, both insured under both policies. Under California law, both insurance policies were required to respond. There was, in fact, aggrieved parties. The aggrieved parties would have been American Casualty having to contribute supposedly to a loss that only St. Paul had incurred. And how would American Casualty have successfully stopped the reformation if they don't claim reliance or collusion? Your Honor, reformation under California law requires a proof, not of detrimental reliance. As a matter of fact, reformation cuts off reliance. If, in fact, you meet the three tests for reformation, the fact that other people may have relied on those written terms doesn't matter. That's why reliance is a red herring in this case. You're going on vert on standard of proof. In other words, that when you get to court with American Casualty, they're saying to these two people, we hear what you say and what you say is this contract doesn't reflect your intention, but you can't meet it. You can't meet your burden by clear and convincing evidence. Is that where you get to? Yes, Your Honor. Because, in fact, what they have is they have a written document that says what it says. At that point, they come in. What would happen is the parties to that case as after September 1995 would have been American Casualty, Granite, and St. Paul. Keep in mind, Your Honor, that the fat was in the fire on these issues in December of 1997. They knew full well that there was a dispute with St. Paul as to what the written terms of the policy were. They took no steps to correct, no steps to change. They made no effort to try and reflect in written terms what this contract was supposed to and intended to say after they had lived with the terms as they would have been written for the last three and a half years. This was a bench trial. This was a bench trial, Your Honor. And findings of fact. And there were findings of fact, Your Honor. And we must find that they were incorrect. The problem, Your Honor, is that the court, by adopting this voluntary reformation concept, which doesn't have any elements, it doesn't have any limits, essentially freed the court from having to make any findings with respect to those issues. Well, they did. He did make some findings dealing with whether or not there had been any reliance or collusion, didn't he? I don't believe there are any findings with respect to collusion, Your Honor. And I think the argument about reliance, we wouldn't dispute. I believe, didn't you argue unclean hands? And wouldn't that be because they were colluding? I think we argued at the time that was one of the defenses, but it wasn't. And didn't the judge reject that? I think it was rejected because he found there was a voluntary reformation, Your Honor. Right. I'd like to reserve the rest of my time. All right. I please the court. I'm Douglas Gault. And with me is my partner, John Peer. We are counsel for plaintiffs, applies, American casualty and transcontinental. I understand your honor's concern about the possibility of collusion if it's probably the gravement of the whole situation, because St. Paul was the insurer for the for the bought company, wasn't it? Yeah, it was going to go out of the picture and it well served the party's interest to let them take the lick and keep the company that was going to continue with the insured unscathed. Isn't that right? I think you're correct. But there are under the Beck case by this circuit, there are two protections for innocent third parties that might be affected by contracting parties corrections of their erroneous written agreements. The first is the requirement that it be shown that the correction reflects the original contracting intent and not some subsequent scheme by those contracting parties. And that decision has to be made. Somebody that was made in this in this case, your honor, that was the centerpiece of the trial before Judge White. He heard testimony from every witness who was involved in the original contracting of the American casualty policy and the St. Paul policy. He's reviewed all of the documents that were generated at the time the negotiations took place. And based on the testimony and the documents, he concluded that the that Granite and American and indeed St. Paul, at the time Gibbons was acquired by Granite, understood that the American casualty policy and all of the insurance policies that were part of the Granite program would apply to the Gibbons risk on an excess D.I.C. basis. That was what everybody understood at the time. So that's one protection that's accorded to so-called innocent third parties that might be affected by a modification. The other one is this doctrine of estoppel. And I understand the counsel for St. Paul to take the position that a reformation would be binding even if St. Paul could show a stopper. I'm not sure that's what the back court said. That's true. Fine. But even if they could avoid the binding effect of a voluntarily reformed or modified or corrected contract by showing a stopper, St. Paul did not do that in this case. Indeed, they've agreed they did not do so. Judge White specifically found they did not do so. And and so neither of the protections that are afforded innocent third parties causes any concern in this case. The modification of the American casualty policy that was affected by endorsements issued by American and accepted by Granite were shown to relate back to their original contracting intent. And St. Paul did not rely to its detriment on the erroneous. At that time, there had been the casualty that's given rise to the claim. That's true. It had taken place. But that didn't cause St. Paul to rely to its detriment. It had its policy was already in place. I know. But if your policy had stated the actual intent, it wouldn't do for you and the insured to get together and say, let's change it now because we can leave St. Paul, even though St. Paul didn't know it and hadn't relied on anything. I agree. You couldn't do that, could you? That's correct. That's California law. And you can't change the terms of the deal. But under California law, what is sacrosanct is the meeting of the minds of the parties, not the writing. This is in the civil code. What is sacrosanct is what the actual agreement of these contracting parties is. And it turns out the written agreement doesn't actually state what the meeting of the minds was. The written agreement is secondary. The written agreement gets subordinated to the actual agreement of the parties. And that was effectuated here. The American casualties showed with an abundance of evidence. I don't believe the clear and convincing evidence standard applies because we were not seeking reformation. But even if it did, the evidence certainly was clear and convincing. Every single document, not the documents created after the fact, every document created at the time of the negotiations reflected an intent both by Granite and American that the insurance be provided on a D.I.C. basis only. And of course, this is the only thing that would make sense. And did the district judge find, as a matter of fact, that there was no collusion of bad faith? Well, implicitly, by finding that the endorsements related back to their original intent, necessarily it wasn't a result of collusion is the result of the parties saying, you know, now it's become clear to us, first of all, with respect to this delay. Delay was certainly an issue at trial, and the witnesses explained why there was a delay. And it has to do with just the complicated nature of writing insurance for large corporations. Keep in mind that this American casualty policy was renewed as of October 1, 1995. And so that that window period from May 1995, when Gibbons had been acquired until October 1, 1995, when Gibbons was folded in to the whole Granite insurance program, that was now history. And they were going forward with all of the get all of the Granite entities covered under the American casualty program. The need to issue endorsements for that may to to through September 1995 period, you know, was of secondary importance. Now, they were concerned about getting the new contract in place. And this is what the witnesses explained to Judge White. This is why they understood that there that there needed to be new endorsements to fully reflect the the contracting intent. They expected those endorsements would eventually be issued, but it was on the back burner. That was the expression. No longer needed any excess difference in coverage. Pardon me? You no longer needed any excess difference in coverage language as of October 1. That's from there. That's right. It was only relevant for that five month period. What about if this is held to have provided collateral coverage and not excess or if it's held to provide only excess DIC, as you argue, does that change the amount of premium due under those policies or did it change? Well, that's an interesting question, Your Honor. The the agreed premium and this was also abundant from the evidence in the record. The agreed premium was to be 34 cents for general liability coverage and one cent for automobile liability coverage under the American casualty policy for the Gibbons risk on an excess DIC basis. If Gibbons if the intent had been to have Gibbons added as part of as an insured with full coverage under the American casualty policy, the premium would have been five dollars and 15 cents. You know, more than 10 times as much. But what was it? It was 30 was collected the 34 cents for GL three and one cent for a for automobile. And had that transaction concluded before this? No, because that was another endorsement that had been delayed. And it wasn't until all of this arose that they realized that premium endorsement had also not been issued. So it's got a line out there like a like a absolute qualified, unqualified promise to pay ten thousand dollars on a date certain signed by solvent sign up and he didn't mean to. You had a policy lying around out there that could provide an awful lot of benefit if there was no St. Paul policy. No, but but granted, hadn't paid any premium for the Gibbons entities under the American casualty policy. It had not paid the 34 cents for the for the excess DIC coverage. It also hadn't paid the five dollars and 15 cents per hundred thousand dollars for total coverage. So it served granted. Well, granted to make it excess DIC. Well, what could have happened is if there had been no St. Paul policy. Well, have you actually served granted very well to have that policy excess because its premium rate was substantially lower than it would have been if it was as written. That's. Yes, definitely. But that that shows why it was sensible for granted to want to purchase only excess DIC coverage. It would make sense for them to get the coverage. Exactly. In fact, no, no consumer insurance wants to buy duplicate insurance. But in this particular case, it would have been even more illogical because not only the high cost of the primary coverage, but both primary policy is the St. Paul and the American casualty policies have very large self-insurance components, deductible components. And there is no reason and certainly St. Paul has never suggested why would have made sense for granted to want to have to pay two deductibles for the Gibbons exposure, a deductible under St. Paul and under American casualty for every Gibbons loss. Now, the only other if Your Honor's have any other questions and I'll submit. Thank you. Thank you. Let's address the two primaries, as the record is clear. In fact, Granite had two primary policies. Granite was also insured under the St. Paul policy. Matter of fact, Ms. Albritton from Granite insisted on it. She wanted Granite covered on the St. Paul policy. She wanted Gibbons and read on the American casualty policy. So why she wanted that, she wanted it. That was enough. As to premiums, the California courts of appeal, they wouldn't even if they weren't insured under the St. Paul policy, they'd have to get primary coverage for the whole thing, wouldn't they? Well, they were insured. They're deductible. They were insured under both policies, Your Honor. I say, well, doesn't it make sense that they'd be insured under that policy for the whatever it is and insured under the American policy for whatever it is? Well, they already had American insurance. They already had American casualty insurance. They didn't need another primary policy, but they wanted to be on St. Paul's policy. And they were. So did the American policy cover the company that had been absorbed? Yes, they endorsed and added them as a named insured. That was Gibbons and Reed. Now, the next the next issue we talk about, I think what's what counsel's confirmed is that in fact, what happened here is the parties accepted the written terms they received in the fall of 1995. They simply had no interest at that time. It was old news. It was water under the bridge. They didn't think they were going to mean anything. They didn't think there was any consequences. As the citizen casualty case makes clear, though, the time for seeking this argument in the district court. Yes, we did, Your Honor. We did it on summary judgment. And as a matter of fact, on summary judgment, where all the facts were undisputed, the court found that voluntary reformation meant that there was no need for judicial reformation, which meant that there was no statute of limitations. The voluntary reformation in this case, and make no mistake, the court found this was a reformation. It didn't say modification. It said this is a reformation. And under California law, as he the court interpreted it, voluntary reformation was viable. We maintain, Your Honor, that it's not. There is no doctrine of voluntary reformation in the case. Is there a case that says you can't agree to correct your contract in California? Is there a case that says the parties cannot agree to correct their contract in California? Actually, Your Honor, there is a case that says that even if the parties seek reformation, but there has been an intervening interest of another party. That's the reliance thing I started out asking on. But if two parties have a contract written up and it's got ten thousand dollars in it where they're meant to write a million. Yes. They can get together and say, hey, get secretary over here and retype this page. It's wrong, can't they? Well, let me posit this one to you. The answer is yes. The answer is yes. As between themselves, they certainly can. But let me posit it to you this way, Your Honor. Could the parties agree to sign a million dollar note, sign the note, exchange it? And then after the fact, after the note's been factored to someone else, say, you know, I think we we made a mistake on that one. You didn't get nine hundred thousand value. You only got a hundred thousand with that. With that illustration doesn't help me. But let me ask you one other thing. Whatever happened to an old institution that used to exist between casualty insurance companies and mutual insurance companies where they got together and arbitrated all these coverage questions and kept them out of the courts? Whatever became of that? I don't know, Your Honor. But sometimes you'd think it would make things easier, wouldn't you? Sure would. Sure would. I think there's a common mistaken belief that taking an appeal to the Circuit Court of Appeals constitutes an injunction against settlement. And I don't believe that's so. And I think we'll. And I think that's probably right, Your Honor. If you're going to make a change in California law, Your Honor, with respect to recognizing a concept called voluntary reformation, I think that's an issue that a California court should be in charge of. There was no basis for voluntary reformation under California law at the time the district court so found. We believe judgment should be reversed. All right. Thank you. Case just argued to be submitted. And for the date we stand, we stand on adjournment.
judges: Hill, Tg Nelson, Hawkins